Filed 4/11/22  P. v. Buchanan CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MIKELL BUCHANAN,<br><br>    Defendant and Respondent. | B305671<br><br>(Los Angeles County<br>Super. Ct. No. BA464579)<br><br>**ORDER MODIFYING OPINION**<br><br>[There is no change in judgment] |

BY THE COURT:

It is ordered that the opinion filed herein on March 16, 2022, is modified as follows:  On page 63, in the first full paragraph, delete from the first sentence "the predicate offenses must have been committed by two or more gang members; (3)" and change "(4)" to "(3)".

The sentence, as modified by this order, shall read as follows:  To prove a "pattern of criminal gang activity" as defined in subdivision (e)(1), under the amended law: (1) the last of the predicate offenses used to demonstrate a pattern of criminal

activity must have occurred within three years of the date the current offense is alleged to have been committed; (2) the predicate offenses must have commonly benefitted a criminal street gang; and (3) the common benefit of the predicate offenses must be more than reputational.

There is no change in judgment.

_____

RUBIN, P. J.        MOOR, J.        BAKER, J.

Filed 3/16/22  P. v. Buchanan CA2/5 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B305671 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA464579) |
| v. | |
| MIKELL BUCHANAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed in part, vacated in part, and remanded.

The Law Office of J. Blacknell and Kellen I. Davis for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Michael R. Johnsen, Supervising Deputy Attorneys General, Michael

Katz, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant Mikell Buchanan of the first degree premeditated murder of Davion Gregory (Pen. Code, § 187, subd. (a)[1] [count 3]), five counts of premeditated attempted murder (§§ 187/664 [counts 5–9]), one count of shooting from a motor vehicle (§ 26100, subd. (c) [count 4]), and five counts of possession of a firearm by a felon (§ 29800, subd. (a)(1) [counts 28–32]).  The jury found true the special circumstance allegations that the murder was accomplished by lying in wait (§ 190.2, subd. (a)(15)) and shooting from a motor vehicle (§ 190.2, subd. (a)(21)), and that Buchanan intentionally killed Gregory while Buchanan was an active participant in a criminal street gang (§ 190.2, subd. (a)(22)).

As to counts 3 through 9, the jury found true the allegations that Buchanan personally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b)–(d)), that a principal discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b)–(e)), and that Buchanan committed the offenses at the direction of, in association with, or for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). It found true the allegations that Buchanan committed the five firearm possession offenses (counts 28–32) at the direction of, in association with, or for the benefit of a criminal street gang (§

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

186.22, subd. (b)(1)(A)).[2]

Prior to the jury's deliberations, the court dismissed the charge that Buchanan attempted to murder Chad Jones (§§ 187/664 [count 13]), and the associated charge of possession of a firearm by a felon (§ 29800, subd. (a)(1) [count 34]).

At the sentencing hearing, the trial court dismissed the five charges of felon in possession of a firearm in the interests of justice. (§ 29800, subd. (a)(1) [counts 28–32].) As relevant here, the trial court also struck the firearm allegations in counts 7, 8, and 9. (§12022.53, subds. (b)–(d), (e)(1).) The trial court imposed firearm use enhancements in counts 3, 5, and 6. As to count 4, the sentence and all allegations were imposed and stayed pursuant to section 654. Buchanan was sentenced to life without the possibility of parole plus a consecutive term of 135 years to life.

In his opening brief, Buchanan contends that (1) the trial court dismissed two jurors in violation of his due process rights, (2) the trial court improperly admitted the statement of a co-participant in the shooting crimes, (3) the trial court improperly excluded evidence of a prosecution witness's prior acts relating to dishonesty, thereby prohibiting cross-examination on that evidence, (4) the prosecution failed to disclose exculpatory evidence in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and elicited evidence that it knew to be false, (5) the possession of a firearm by a felon charges in counts 28–31 were

_____

[2] Buchanan was tried with co-defendants Darrell Caldwell and Devante Caldwell. The jury acquitted Buchanan of conspiracy to murder in count 1, dissuading a witness in count 10, and the attempted murder of Victor Miller in count 12.

3

barred under *Kellet v. Superior Court* (1966) 63 Cal.2d 822 (*Kellet*), and (6) there was insufficient evidence to support Buchanan's convictions relating to the December 10, 2016 shootings.[3]

On January 1, 2022, while Buchanan's appeal was pending, Assembly Bill No. 333 (Stats. 2021, ch. 699, §§ 1–5) (Assembly Bill 333) became effective. The legislation imposes additional elements, beyond the elements that were required at the time of Buchanan's trial, to impose gang enhancements charged pursuant to section 186.22. The Legislation also adds section 1109, which, as relevant here, provides for the bifurcation at trial, upon a defendant's request, of the gang enhancement allegations charged under section 186.22, subdivisions (b) and the other charged offenses. We invited the parties to file supplemental briefing regarding the effect, if any, of Assembly Bill 333 on Buchanan's case.

The parties filed letter briefs. Buchanan argues, and the People concede, that the amendments Assembly Bill 333 made to section 186.22 apply to his case, as the new law became effective while the case was still pending on direct appeal. Based on the amendments, Buchanan asserts that the gang allegations, as well as the gang special circumstance (§190.2, subd. (a)(22)) and gang-related firearm enhancements (§ 12022.53, subd. (e)) that incorporate section 186.22, must be vacated and the case remanded. The People respond that remand is unnecessary, because there is no reasonable doubt that the jury would have

---

[3] Buchanan also argued that the trial court abused its discretion by admitting evidence of predicate offenses and other criminal conduct to prove the gang allegations. In light of our disposition, it is not necessary for us to address the issue.

4

found the gang allegations true under the new requirements. The parties also disagree regarding whether section 1109 has retroactive effect. While Buchanan asserts that section 1109 must be applied to his case, the People argue that the newly enacted legislation does not alter the substantive requirements for imposition of gang enhancement allegations, and therefore applies prospectively only, not retroactively to cases pending on direct appeal, such as Buchanan's case.

We affirm the convictions for murder, attempted murder, shooting from a motor vehicle, and possession of a firearm by a felon. We vacate the sentence enhancements imposed under sections 186.22 and section 12022.53, subdivision (e), and the section 190.2, subdivision (a)(22) special circumstance allegation, and remand for further proceedings consistent with this opinion. The firearm enhancements imposed for Buchanan's personal firearm use under section 12022.53, subdivision (d) in counts 3, 5, and 6, and imposed and stayed in count 4 are unaffected by Assembly Bill 333, and remain intact.

## FACTS

### *Prosecution Evidence*

#### The Offenses

In 2015, Daveion Ervin became part of a group of rappers who called themselves Too Greedy Family/STINCC Team (Too Greedy). Ervin used the moniker Solo. He discovered the group after he became familiar with Darrell Caldwell, who was a popular underground rapper known as Drakeo the Ruler. Too Greedy had about 20 to 30 members when Ervin was part of the

group. Too Greedy members belonged to several different Crips gangs. Buchanan, who was a member of the Rollin 100's Crips gang (Rollin 100's) and went by the moniker Kellz, was also a member of Too Greedy and a close friend of Darrell Caldwell. Devante Caldwell, Darrell's brother, was a member of Too Greedy, and went by the moniker Ralfy the Plug.[4] Joshua Torres was also a member of Too Greedy, and was known as Too Shitty. Jaidan Boyd, who was younger than most of the Too Greedy members, started hanging out with Too Greedy members in the summer of 2016. Boyd wanted to be a rapper. He was a member of the Rollin 40's Crips gang (Rollin 40's) and used the moniker AB.

Too Greedy members were "flockers," which is a term for a burglary crew. They often stole from Asians. They were also known as the STINCC Team; STINCC is a derogatory term for Asians. Too Greedy members had a hand sign that they used and had Asian and money-themed tattoos.

Too Greedy had problems with people in several Bloods gangs. In December of 2016, Darrell Caldwell had a rivalry with "RJ", a member of the Athens Park Bloods, who was also a popular rapper. They disagreed about who was the better rapper and agreed to fight at one point, though the fight never occurred.

On December 10, 2016, Ervin went to a pajama party in Carson with Buchanan and approximately ten other Too Greedy members. They caravanned to the party in four or five cars. Darrell Caldwell drove Ervin and Buchanan to the party. Ervin sat in the front passenger seat and Buchanan sat in the back passenger seat. Boyd joined the group in a separate car as they

---

[4] Darrell and Devante Caldwell were tried with Buchanan but are not parties to this appeal.

6

were leaving.  The group pulled into the parking lot at the party but did not go inside.  They were sitting in their vehicles when a group of six males walked past quickly.  Ervin recognized one of the males as Gregory (the murder victim) or "Red Bull" from Inglewood Family Gangsters, a Bloods gang.[5]  Inglewood Family Gangsters were rivals of Boyd's gang, the Rollin 40's.

Just as the group reached the front of Darrell Caldwell's car, Ervin heard gunfire and ducked down.  When Ervin looked up again there was a lot of commotion—people were running and the gunfire was ongoing.  Ervin thought they were under attack from a Bloods gang.  He saw Buchanan holding a .40 caliber Glock pistol.  Buchanan said, "I emptied the clip on the nigga." Boyd was standing outside of his vehicle and still shooting a .38 caliber revolver.  When the shooting stopped, most of the group drove to Darrell Caldwell's house.  When they arrived, no one knew if anyone had been hit by the gunfire.  Ervin went to sleep, but Torres woke him up at about 3:00 a.m., and told Ervin that Red Bull had been killed.

Sometime after the shootings, Ervin saw Buchanan in a video on social media.  He was drinking and said that he was "sipping on some dead bull."  On another occasion, Ervin heard Buchanan imply that anyone who spoke about the shootings would be killed.  When Buchanan and Ervin were in jail together, Buchanan told Ervin, "If you basically don't say anything, we're gonna be okay."

---

[5] The other males were Travis Harvey-Broom, Kwentin Polk, Terance Harvey, Steve Lawhorn, and Kemoni Rich, the named victims in counts 5–9.

## Boyd's Statement to a Confidential Informant

Los Angeles County Sheriff's Department's Homicide Detective Francis Hardiman investigated the crimes. After Boyd was arrested, Detective Hardiman placed him in a cell with a confidential informant and recorded their conversation. Boyd told the informant he was from the Rollin 40's and known as Arlington Blue or AB. He said he'd been caught on video "smoking somebody." He said he was with "a gang of niggas that's all in jail right now." Boyd thought someone was snitching on him because out of the many people arrested, the police accused him of shooting with Buchanan, who was, in fact, the other shooter. He said, "We really wasn't to be going on a mission. It's just when we got there, we was there for a nigga from Athens." "But in the parking lot, I seen the nigga I was beefing with from Inglewood." He agreed with the informant's statement that the victim was at the wrong place at the wrong time and "fell in [their] glove."

Boyd said that he used a .38 caliber revolver, which would not leave behind shells. The other shooter "cracked with a 40 or something." Boyd told the informant no one got caught with a gun afterward. Darrell Caldwell had a very distinctive car that witnesses probably recognized at the scene, so the police raided his house. They found several guns, but not the ones used in the shootings.

Boyd told the informant, "I popped cuh, and then he was limping out of the paddy, and I went to the car with the blower, but you can't see none of this on video, because I had moved my car . . . ." The informant asked whether Boyd shot the victim in the head, and Boyd replied, "I shot the nigga . . . the last two

8

times.  He might've got shot in the head, though.  I don't know."
Boyd said, "On the hood, me and Kellz the last two niggas [the
police] got.  They got everybody else and they got us two last.
That's why I know they got something."  He and the confidential
informant speculated as to who the snitch might be.

### Ballistics Evidence

Several .40 caliber cartridge cases and .38 special-fired
rounds were recovered from the crime scene.  Los Angeles County
Sheriff's Department Deputy Ivan Chavez, a firearms examiner
from the scientific services bureau, determined that all the .40
caliber cartridge cases were fired from the same Glock pistol.
Officers later recovered a Glock pistol, which Deputy Chavez fire
tested and determined to be the pistol that fired the .40 caliber
cartridge cases found at the scene.

A video filmed about two months before the shootings
showed Buchanan pointing the pistol.  The serial number was
visible in the video.  Darrell and Devante Caldwell appeared in
the video with Buchanan.  Other people possessed the pistol
between the date the video was made and the shootings.

About a month after the crimes, another video showed
Buchanan holding a .40 caliber Glock pistol.  Printed words on
the video indicated a member of Inglewood Family Gangsters had
been killed.  Someone in the video mentioned "Red Bull."

### Gang Evidence

Detective Hardiman testified that Too Greedy was a
criminal street gang.  He identified Buchanan and about 19 other

9

members of the gang and testified regarding their tattoos and the primary activities of the gang.

## Other Crimes Evidence from Ervin (Dismissed Counts 13 & 34)

Detective Hardiman identified Ervin as someone present at the shootings through surveillance camera footage. Ervin agreed to cooperate in exchange for a reduced sentence on other charges against him. To test the veracity of Ervin's information concerning the December 10, 2016 shootings, Detective Hardiman asked him to provide information on other shootings. Ervin did so, and Detective Hardiman was able to verify the information that Ervin gave him regarding seven different shooting incidents. Ervin told Detective Hardiman that Buchanan told him he shot "7 Flame" in the hand somewhere near Crenshaw and Manchester. Information that Detective Hardiman was given by other law enforcement agencies corroborated that Chad Jones, who went by the moniker 7 Flame, had been shot in the hand on January 9, 2015.

*Defense*

Buchanan's counsel confronted Detective Hardiman with the fact that California Department of Corrections records showed Buchanan was incarcerated on January 9, 2015, and could not have committed the crimes charged in counts 13 and 34 (i.e., the shooting of 7 Flame on that date). Both charges were dismissed prior to the jury's deliberations.

Detective Hardiman testified that, prior to reaching an

agreement with Ervin, he told Ervin that he knew Ervin lied and he believed that Ervin was a shooter. Detective Hardiman also told Ervin that his potential sentence was 75 years to life.

An expert witness for co-defendant Darrell Caldwell opined that Too Greedy was not a criminal street gang. He testified, "This is the very first case that I'm aware of that a rap entertainment group is considered a criminal street gang in the presence of the court."

## DISCUSSION

### I. Dismissal of Jurors

Buchanan first contends that the trial court violated his right to an impartial jury by excusing two sworn jurors prior to deliberations without substantial cause. We reject the contention. The record demonstrates that the trial court discharged Jurors No. 3 and 12 after they repeatedly disregarded the trial court's admonitions not to discuss the case. Juror No. 3 also removed his notebook from the courtroom and misrepresented his arrest record.

#### Legal Principles

"Under Penal Code section 1089, '[i]f at any time, whether before or after the final submission of the case to the jury, a juror . . . upon . . . good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate' to replace the discharged juror. A failure to follow the court's instructions is

11

misconduct and a basis for dismissal.  (*People v. Williams* (2015) 61 Cal.4th 1244, 1262 [(*Williams*)]; *People v. Linton* (2013) 56 Cal.4th 1146, 1194 [(*Linton*)].)  This extends to the obligation not to discuss a case prematurely . . . .  'A juror's violation of these directions constitutes serious misconduct.'  (*Williams*, at p. 1262; see *People v. Sandoval* (2015) 62 Cal.4th 394, 437; *People v. Weatherton* (2014) 59 Cal.4th 589, 599 & fn. 10; *People v. Ledesma* (2006) 39 Cal.4th 641, 743; *People v. Daniels* (1991) 52 Cal.3d 815, 863–866.)"  (*People v. Peterson* (2020) 10 Cal.5th 409, 472, fns. omitted (*Peterson*).)

"""The . . . ultimate decision whether to retain or discharge a juror . . . rests within the sound discretion of the trial court.'"  (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 486 [(*Sattiewhite*)]; see *People v. Williams, supra*, 61 Cal.4th at p. 1262.)  "In determining whether juror misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'"  (*People v. Linton, supra*, 56 Cal.4th at p. 1194; see *People v. Nesler* (1997) 16 Cal.4th 561, 582.)  We will uphold the trial court's decision if the record supports the basis for that decision as a '"demonstrable reality."'  (*Williams*, at p. 1262.)  This means simply that the record must reveal the reason for the court's decision to discharge a juror and in turn substantial evidence must support that reason.  (*People v. Duff* (2014) 58 Cal.4th 527, 560.)  So long as it does, '"the court's action will be upheld on appeal."'  (*Sattiewhite*, at p. 486.)"  (*Peterson, supra*, 10 Cal.5th at pp. 472–473.)

**Proceedings**

In voir dire, the court asked if any of the jurors had been arrested. Juror No. 3 responded that he had been arrested for Marijuana possession in 1999. He did not have a trial, and felt that he was treated unfairly because the court found that the officer was qualified to smell Marijuana in Juror No. 3's car as it passed him. Juror No. 3 also stated that the ultimate outcome was positive, however, because he was ordered to participate in a rehabilitation program and had not smoked cigarettes, drunk alcohol, or ingested drugs since. Juror No. 3 also indicated that he had positive experiences with law enforcement. His next door neighbor, with whom he had a close relationship, was a retired sheriff's deputy. His sponsors during the rehabilitation program were a former sheriff and a juvenile probation officer.

Prior to opening statements, the trial court admonished the jury not to "talk about the case or about any of the people or any subject involved in the case with anyone, not even your family, friends, spiritual advisors, or therapists", not to discuss the trial with other jurors prior to deliberations, to keep an open mind throughout the trial and not decide any charge or issue until deliberations, and not to remove their notebooks from the courtroom.

The court repeatedly advised the jury not to discuss the case before excusing the jurors for recesses.

*First Hearing on Juror Misconduct*

On July 8, 2019, after weeks of witness testimony, Juror No. 6 called the clerk over the lunch break to report that some

jurors had been discussing the case despite the court's admonitions. The court again reminded the jury not to discuss the case before their afternoon break. The court had given the admonition throughout the trial and, in particular, several times on that same day. After the court released the jurors for the day, Alternate Juror No. 4 called the clerk to inform the court that Juror No. 12 was continuing to speak about the case both in the jury room and as she was "walking out of the courtroom in front of the audience members, which could include the defendants' families, by making loud remarks, including 'I don't believe these gang allegations,' and other comments stating that she has already decided the case. [¶] Several other jurors have asked her not to talk about the case, but she continues to do so and is making other jurors uncomfortable, especially when she speaks about it in front of family members." The court stated that, because Juror No. 12 continued to disregard the court's admonitions, it was necessary to conduct a hearing in which it asked each juror about the issue separately.

In the hearing, Juror No. 6 stated that a few jurors were concerned because approximately two to four other jurors were discussing the case during breaks, and had been doing so for approximately five days. Juror No. 6 identified Jurors No. 3 and 12 as "pretty much the main two, and then everybody else, whoever is around, responds to questions." Both jurors had discussed "certain witnesses, whether they are telling the truth or not." Their discussion about the case had increased over time. Other jurors were "not really initiating it." Juror No. 6 could not recall which other jurors had participated in the conversations.

Alternate Juror No. 4 stated that he or she had observed Juror No. 12 speaking about the case in the jury room at least 10

14

times. This began the first week of trial, but her comments had grown more detailed. Juror No. 12 talked about "how she feels about the particular charge and which way she plans to vote." Alternate Juror No. 4 heard Juror No. 12 speaking about the case outside of the jury room three or four times. She had been talking about the case in the jury room the day before. Another juror made a comment to the effect of "'Oh, hope this room isn't bugged.' And she did not take the hint." Juror No. 12 talked both inside and outside the jury room "a lot" about not believing the gang allegations. Other jurors would respond to her, but in a less detailed manner. To Alternate Juror No. 4's knowledge, none of the other jurors had indicated how they would vote. The court inquired as to whether Juror No. 3 spoke about the case, and Alternate Juror No. 4 responded, "Yeah, a little bit, yeah. He will not talk as much as her, but he will talk some." Juror No. 3 made a comment about how slang terms were being defined, but Alternate Juror No. 4 did not recall the substance of the comment.

Juror No. 1 noticed that Juror No. 3 brought his notes into the jury room. Juror No. 3 had opened a pad of paper and showed another juror something. Juror No. 1 did not hear what Juror No. 3 said to the other juror.

Juror No. 3 stated that the only comments jurors had made were that they were confused about which defendants each of the many charges applied to. Juror No. 3 had taken his notes into the jury room to study them because he was under the impression that "we can't take our notes into the deliberation". The court advised Juror No. 3 that he would have access to his notes during deliberations.

Juror No. 12 denied hearing any juror make comments

15

about the case.

Juror No. 8075 overheard part of a discussion between two jurors. She could not remember exactly what was said but "[she thought] it was an agreement between just two of the jurors." Although she could not be certain, she thought that the jurors who were talking were Jurors No. 5 and 12.

All of the jurors were questioned, but no other jurors reported discussion of the charges or voting; some reported more general comments. After questioning ended, the court stated: "So after interviewing the jurors and having at least three jurors identify Juror No. 12, that would be the two jurors that called in, Juror No. 6, one of the alternates, and another juror that I inquired with this morning who said Juror No. 12 had been making comments and statements about the case, the court finds that there has been judicial [*sic*] misconduct and Juror No. 12 will be excused from the jury."

Devante Caldwell's counsel objected to the dismissal of Juror No. 12. He argued there was no evidence that her comments had an effect on other jurors, and he did not believe that the comments indicated that she would be unable to serve as a juror because of bias or prejudice. Juror No. 12 had not been asked about her own comments, and she may not have understood that the comments she made constituted discussion of the case.

Darrell Caldwell's counsel argued that he did not believe the other jurors' statements that Juror No. 12 made comments in front of the defendants' families were credible in light of where they were seated in the courtroom.

Buchanan's counsel argued that a less severe response, such as a stern admonition, was appropriate.

16

The court brought Juror No. 12 back into the courtroom for further questioning. The court confronted Juror No. 12 with the statements the other jurors had made about her. She denied talking about the case. She said that Juror No. 2 had started talking to her about gangs, and she thought he was "bipolar or something" because she had not been speaking about anything pertaining to gangs.

Outside of the presence of the jurors, the court stated that it did not believe that the issue was whether Juror No. 12 indicated that she could be fair; the misconduct itself warranted dismissal. Other jurors discussed confusion about the charges and how many there were, the length of the process, and their general confusion. Juror No. 12 made comments of a different nature, concerning her views on the case. The trial court stated that it had to "make a credibility call." The court ruled that Juror No. 12's continued disregard of the court's admonitions was grounds for dismissal, and then dismissed her.

*Second Hearing on Juror Misconduct*

On the afternoon of July 11, 2019, the clerk received a call from Alternate Juror No. 4694, asking for clarification of the admonition not to talk about the case. Alternate Juror No. 4694 stated that several jurors made comments in the jury room and the hallway about the attorneys, the defendants' physical appearances, witnesses, and witness testimony. The comments were not necessarily discussing the case, but related to their confusion or were comments made aloud in the jury room but not addressed to another juror.

On July 12, 2019, Buchanan's counsel proffered evidence

17

that Buchanan was in custody at the time Chad Jones was allegedly shot and could not have committed the offenses charged against him in counts 13 and 34.  Defense counsel called Detective Hardiman to the stand.  Detective Hardiman testified that Ervin had not told him Jones was shot on January 9, 2015, but instead that the shooting occurred in August of 2016.  Detective Hardiman assumed that Ervin misremembered the date, and he had mistakenly testified that Ervin told him the shooting occurred on January 9, 2015.

After Detective Hardiman's testimony concluded, the trial court discussed the issue of possible juror misconduct with counsel outside the presence of the jury.  The court then conducted another hearing to ascertain whether juror misconduct had occurred again.  Buchanan's counsel and counsel for Devante Caldwell and Darrell Caldwell objected to holding the hearing.

At the hearing, newly seated Juror No. 12 stated that comments had been made about the volume of the attorney's voices in sidebar, and about Detective Hardiman's manner.  Juror No. 12 heard one of the jurors make the comment, "I hope they brought some gloves," while sitting in the jury box during sidebar.  Juror No. 12 did not know which juror had commented.

Juror No. 10 stated that "[t]here was an outburst today while you guys were at sidebar about corruption and stuff like that.  [Juror No. 3] had personal feelings . . . [he was] referring to a point in time where [he was] treated unfair.  So [he] had a really passionate outburst while you guys were at sidebar."  Juror No. 10 said other jurors had to calm Juror No. 3.

Juror No. 9 confirmed that Juror No. 3 had an outburst that day.  Juror No. 3 said personal things, but nothing about the case.

Juror No. 7 thought that Juror No. 3 was upset about the case because of his body language. Juror No. 7 did not hear Juror No. 3 comment on the case.

Juror No. 6 stated that Juror No. 3 had made a lot of comments about Detective Hardiman and other law enforcement officers over the past several days. The court asked, "As Juror No. 3 is making these comments, is he making comments about the credibility, the believability of Detective Hardiman or the evidence that is presented through him?" Juror No. 6 responded, "I would say so. He doesn't call him Detective Hardiman. He calls him Fur[h]man, Mark Fur[h]man."

Juror No. 4 had heard other jurors make comments about the case that week, but could not recall the substance of the comments.

Juror No. 3 denied hearing other jurors discuss the case that week. Juror No. 3 disclosed that he had cried that day. He explained, "I cry because I've been arrested over 50 times, and I'm not in prison. And I -- by law I should be doing three strikes. . . . the defense witness, more or less, put one of the defendants up for life in prison. And I was very moved by this when the man was not guilty whatsoever." Juror No. 3 denied referring to Detective Hardiman as Fuhrman or Detective Fuhrman. He told the trial court that he could be a fair and impartial juror.

Alternate Juror No. 4694 stated that someone had made a mean joke about Buchanan and Darrell Caldwell. The jurors had laughed because the attorneys were bickering at sidebar. Juror No. 7 participated in the comments. Jurors No. 2 and 7 also made comments about the hip hop scholar and the gang expert the day before. Juror No. 7 said the hip hop scholar was "on point." Juror No. 5 and possibly Juror No. 9 had been discussing

19

whether they liked the gang expert's testimony as they exited the courtroom.

Alternate Juror No. 9994 stated that the jurors commented that the attorneys did not get along. Juror No. 3 made comments about the attorney's conversations in sidebar "all the time. And I'm, like, looking at him, like, dude. Hold it together." "Just the other day [the prosecutor] said, 'We're gonna bring our last witness up.' And I'm sure you guys heard it. [Juror No. 3] said 'Good.' I don't need to hear that." Alternate Juror No. 9994 said that while the attorneys were at sidebar and Detective Hardiman was on the witness stand, "[Juror No. 3] is over here telling this guy, you know -- you know, something about how many white people have you seen pay for the price of this and that. And how many white people have you seen go to prison . . . ." Juror No. 3 also said, "'I'm glad I'm here so I can interject my -- my opinion into this corrupt society.'"

Alternate Juror No. 9222 told the court that Juror No. 3 said something about Detective Hardiman's testimony while in the jury box. Alternate Juror No. 9222 did not remember the comment verbatim, and stopped listening to Juror No. 3. Juror No. 3 was emotional when he made the remark. Juror No. 3 also told Alternate Juror No. 9222 that the court said Juror No. 3 could take his notebook with him outside of the jury room and outside of the courthouse. The court responded that Juror No. 3 was not told he could take the notebook outside.

The court again questioned Juror No. 3. Juror No. 3 denied taking the notebook outside of the courthouse. The court asked if he took the notebook outside of the jury room. Juror No. 3 responded that he took his notebook with him to lunch, but kept it in his bag. He said he had asked the court if he could take the

20

notebook and study it.  The court responded, "Yes, you did ask that, and I told you you could take it into the jury room to review your notes. . . . But otherwise, the juror notebooks are to remain either in this courtroom or inside the jury room."  Juror No. 3 responded, "I usually carry a bag and the book was in my bag all the time."

Outside the presence of the jury, the court noted that "[Juror No. 3] claims that he's had [his notebook] in his backpack or some protective thing that he cares, [*sic*] and has taken them to lunch.  But it was Alternate Juror No. 9222 who's noticed that -- and had to observe him with that notebook outside of the courtroom as well as the court's jury room."

The court did not deem the other juror's comments about raised voices at sidebar to be misconduct.  With respect to the mean joke that Alternate Juror No. 4694 reported, the court did not consider that serious, but would inquire if the parties were concerned.  The court noted that Alternate Juror No. 4694 had heard other statements about the gang experts, but had not reported specifics.  Again, the court offered to inquire further if the parties wished, but did not feel that this would cause any of the jurors involved to be impartial.  All of the parties agreed that Jurors No. 2, 7, and 9 did not need to be questioned further.  No party requested that Juror No. 5 be questioned again.

The court excused Juror No. 3 because, even assuming Juror No. 3 was exaggerating when he said he was arrested over 50 times, he did not disclose that he had been arrested even five times, let alone 50 times, during voir dire, although he was asked the question directly.  Juror No. 3 made comments to other jurors about society being corrupt and compared Detective Hardiman with Mark Fuhrman.  Juror No. 3 admitted he took his notebook

21

outside of the jury room and into the cafeteria at lunch, which another juror observed.

Analysis

The trial court did not abuse its discretion by dismissing Jurors No. 3 and 12 for misconduct.  The trial court excused Juror No. 12 because she repeatedly disregarded its admonition not to speak about the case.  The record shows that three other jurors stated that Juror No. 12 had been talking about the case.  Two of those jurors indicated that she had done so many times, both inside the jury room and while exiting the courtroom.  Both jurors indicated that she had discussed the gang allegations repeatedly and indicated how she planned to vote.  One juror described Juror No. 12 as instigating discussion about the witnesses and their credibility.  That juror stated that other members of the jury had requested that Juror No. 12 stop speaking about the case, but she continued to do so.  Juror No. 12's behavior continued for a substantial period of time, despite the fact that the trial court admonished the jurors, before opening statements and each time that it excused the jury, not to speak with anyone about the case.

When questioned about her behavior, Juror No. 12 denied speaking about the gang allegations.  She said that Juror No. 2 had approached her and started talking about gangs.  The court made a "credibility call" and credited the statements of the three jurors who identified Juror No. 12 as making comments about the case over Juror No. 2.  We defer to the trial court's credibility determination, which was based on its direct observations of the jurors and their demeanor.  (*Peterson*, *supra*, 10 Cal.5th at p. 473;

22

*Williams*, *supra*, 61 Cal.4th at p. 1262.) "[A trial] court's determination that [a juror] was being less than fully truthful . . . [is] a determination the court could rely on in deciding to excuse the juror." (*Peterson*, *supra*, at p. 473.)

Given the number of times that the jury was admonished not to talk about the case and the number of times Juror No. 12 ignored these admonitions, the trial court's finding appears on the record as a demonstrable reality, and a valid reason for excusal. (*Peterson*, *supra*, 10 Cal.5th at p. 472 [dismissal appropriate where other jurors testified that juror had violated directive not to talk about case]; *Williams*, *supra*, 61 Cal.4th at p. 1262; *Linton*, *supra*, 56 Cal.4th at p. 1194.)

The trial court's finding that Juror No. 3 committed misconduct also appears on the record as a demonstrable reality. Two other jurors identified Juror No. 3 as making inappropriate comments about the case. One juror testified that Juror No. 3 made multiple comments about Detective Hardiman, including calling him "Furman,"—a comment on the detective's credibility. Another juror confirmed that Juror No. 3 made a comment concerning the detective, although that juror did not remember the substance of the comment. Juror No. 3 made these comments after the court had already held a hearing at which the jurors were each informed that there were allegations that jurors were disobeying the court's admonition not to talk about the case and then questioned about other jurors' behavior in this regard. Juror No. 12 had been dismissed immediately following that hearing. Several more days passed, during which the trial court continued to admonish the jury not to speak about the case. As with Juror No. 12, Juror No. 3 denied having made any comments; and, as with Juror No. 12, we defer to the trial court's

23

determination that Juror No. 3 was not forthcoming about disregarding the court's admonitions. (*Peterson*, *supra*, 10 Cal.5th at p. 472; *Williams*, *supra*, 61 Cal.4th at p. 1262.)

The misconduct was compounded when Juror No. 3 explained that he had become emotional because of the numerous times that he himself had been arrested. Although it is highly likely that Juror No. 3 exaggerated when he said he had been arrested 50 times, his explanation stands in stark contrast to his testimony in voir dire that he had been arrested once, and had positive experiences with law enforcement officers. As the trial court pointed out during the hearing, whether Juror No. 3 was truthful in voir dire or during the juror misconduct hearing was irrelevant—in either case he had not been honest with the court.

Finally, Juror No. 3 had also disobeyed the court's directions by removing his notebook from the courtroom. The court was informed that Juror No. 3 had his notebook in the jury room with him and was showing another juror something in the first juror misconduct hearing. At the second juror misconduct hearing, a different juror informed the court that Juror No. 3 had taken his notebook to the jury room and outside both the jury room and the courtroom. Juror No. 3 confirmed that he had taken the notebook to lunch every day. This was a violation of the court's instructions.

The trial court stated its reasons for dismissing both jurors on the record, and in both instances juror misconduct is a demonstrable reality. The trial court did not abuse its discretion by dismissing them.[6]

---

[6] Buchanan forfeited any complaints that other jurors should have been dismissed for misconduct. The trial court offered to question the jurors more extensively if counsel desired

24

## II. Admission of Boyd's Statements Against Penal Interest

Buchanan next contends that the trial court violated California evidentiary law and his constitutional right to due process by admitting hearsay statements that Boyd made to the confidential informant. His contention is without merit.[7]

### Legal Principles

"Although hearsay statements are generally inadmissible under California law (Evid. Code, § 1200, subd. (b)), the rule has a number of exceptions. One such exception permits the admission of any statement that 'when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it

---

that it do so, but Buchanan declined, and did not seek a mistrial on this basis. (*People v. Russell* (2010) 50 Cal.4th 1228, 1250 ["A claim of prejudicial misconduct is waived when the defendant fails to object to a juror's continued service and fails to seek a mistrial based upon prejudice."].)

[7] Buchanan also challenges the trial court's admission of statements that he and Devante Caldwell made to informants. These challenges are forfeited because Buchanan failed to object at trial. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 416–417.)

to be true.'  (Evid. Code, § 1230.)  As applied to statements against the declarant's penal interest, in particular, the rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements.  [Citation.]

"To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.'  [Citation.]  'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'  [Citation.]" (*People v. Grimes* (2016) 1 Cal.5th 698, 710–711, fn. omitted (*Grimes*).)

"[O]ur Supreme Court has admonished that '[o]nly statements that are specifically disserving to the hearsay declarant's penal interests are admissible as statements against penal interests.  [Citations.]'  [Citations.]  [Evidence Code] [s]ection 1230 does not authorize the admission of 'those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others.'  [Citation.]" (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 70–71 (*Gallardo*).)  "A 'statement "which is in part inculpatory and in part exculpatory

26

(e.g., one which admits some complicity but places the major responsibility on others) . . . is . . . inadmissible." [Citations.]' [Citation.] Thus, "'an approach which would find a declarant's statement wholly credible *solely because* it incorporates an admission of criminal culpability is inadequate." [Citation.]' [Citation.]" (*Id*. at p. 71.)

"'That a hearsay statement may be facially inculpatory or neutral cannot always be relied upon to indicate whether it is "truly self-inculpatory, rather than merely [an] attempt[ ] to shift blame or curry favor." [Citation.] Even a hearsay statement that is facially inculpatory of the declarant may, when considered in context, also be exculpatory or have a net exculpatory effect.' [Citation.]" (*Gallardo*, *supra*, 18 Cal.App.5th at p. 71.) However, "the nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant. Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.'" (*Grimes*, *supra*, 1 Cal.5th at p. 716.)

"We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion. [Citations.]" (*Grimes*, *supra*, 1 Cal.5th at pp. 711–712.)

27

### Proceedings

Prior to trial, the prosecutor sought to admit excerpts of statements that Boyd made to the confidential informant. Buchanan's counsel suggested that it would be prudent to review all of the statements in the transcripts in light of the holding in *Gallardo*, *supra*, 18 Cal.App.5th 51, that transcripts are not to be admitted wholesale. The prosecutor provided copies of the excerpts for the parties and the court so that the transcripts could be reviewed and argued in detail. The court stated that it would set aside time to review the statements and then re-visit the prosecution's motion after jury selection had begun.

At a hearing on the matter, the trial court stated that it had reviewed the 58 pages of transcript excerpts. Counsel for each of the defendants was given the opportunity to contest specific statements, and did so. Buchanan's counsel objected to the statements Boyd made that implicated Buchanan on the general ground that the transcripts contained multiple levels of hearsay.

Specifically, he cited Boyd's statement regarding the other shooter that "[h]e cracked with a 40 or something." Counsel argued that the particular statement related to Buchanan, whom Boyd had identified as the second shooter. Although counsel assumed that the prosecution would proffer other evidence that Buchanan used a .40 caliber gun in the shooting, the information still had to be sufficiently reliable to be admitted through Boyd's statement. Counsel expressed concern that it was unclear "where the information came from." The wording of his statement suggested that Boyd did not know what caliber weapon Buchanan had used.

The trial court ruled that the statement was reliable and admissible. The court reasoned that whether Boyd was stating that he knew the caliber of the gun, or just that he thought he knew the caliber of the gun but was not certain, was a question for the jury. The phrasing could simply be Boyd's manner of speaking. The People had other evidence that the gun was, in fact, a .40 caliber.

Counsel next objected to statements the informant made as he and Boyd were discussing who may have snitched on Boyd:

> "U/C: Okay. Solo, Shitty and Drake The Drooler.
> "Boyd: Either one of them niggas telling or they told somebody to tell.
> "U/C: *Yeah, because I don't think Kellz going to say, hey, man, I had the .40 . . .*
> "Boyd: Huh uh.
> "U/C: And AB had the eight ball, you feel me?
> "Boyd: Yeah, exactly. That's why that's why I know it's not him, on wood. . . ." (Italics added.)
>     . . .
> "U/C: *Yeah, because I don't think the nigga Kellz going to say I don't even think Kellz is going to tell nobody like man, me and the homey went on a mission, you know. I had the .40; he had the eight ball. I don't think Kellz that type of nigga.* I don't think he going to do nothing. But, like you said, that nigga Solo, Shitty, Drake The Drooler or whoever . . ." (Italics added.)

Counsel argued that the statements were hearsay because they were made by the undercover informant, not Boyd. The informant was not present at the shooting and did not personally know what kinds of guns were used.

The court ruled that the informant's characterization of the gun as a "40" did not add facts or shift blame; the informant was simply repeating information Boyd had already shared with him. The court offered to instruct the jury that the informant was not present, and that it could not consider his statements for their truth, only for context.

Counsel objected that Boyd's statement in the following excerpt was unreliable because Boyd was trying to shift the blame and distance himself from the crime.

> "U/C: You shot that nigga in the head?
> "Boyd: I shot the nigga at -- the last two times. *He might've got shot in the head, though. I don't know*." (Italics added.)

The court responded that it did not view the statement as shifting the blame. Boyd admitted to shooting Gregory twice and did not deny that he might have shot him in the head, he was simply stating that he was not certain if he had.

Counsel also argued that Boyd's statement that Torres's girlfriend was probably the snitch was hearsay:

> "Boyd: You know, the only thing that, like, what I know is who telling on who, it's the nigga girlfriend. They just showed me a picture of her too.
> "U/C: Who?

"Boyd:  The nigga Too Shitty girlfriend.

"U/C:  Too Shitty?

"Boyd:  *They got her in jail so she in custody. So she probably just like, I know who did it and she told on me and the nigga Kellz because she wanted to get out.*"  (Italics added.)

The court ruled the statement admissible.  Boyd was speculating as to who the snitch was, not speculating regarding the other shooter's identity.  Throughout the conversation Boyd had identified two shooters – himself and Buchanan.  The court did not view the statement as hearsay, because Torres's girlfriend had not given Boyd information that he was repeating.  He was simply speculating himself.

Finally, the court ruled that all of the statements in the excerpts were non-testimonial, because Boyd believed that the undercover informant had been arrested and did not realize that he was an agent of the police.

The transcripts were admitted at trial.

## Analysis

*"Bulk" Statements*

Buchanan relies on *Gallardo, supra*, 18 Cal.App.5th 51, to support his claim that the trial court erred by admitting Boyd's statements to the confidential informant in bulk, without individually assessing whether each statement was admissible as a declaration against interest.  We reject the contention.

In *Gallardo*, the trial court admitted a transcript of a

31

declarant's conversation with undercover informants in its entirety "because it found certain details [the declarant] had provided to the informants regarding the crime (including his identification of [one of the defendants] as the shooter, his description of the vehicles used and the route they drove) showed his entire statement was sufficiently trustworthy to warrant its inclusion as a declaration against interest." (*Gallardo*, *supra*, 18 Cal.App.5th at p. 72.) The Court of Appeal held that the trial court abused its discretion because it failed to assess whether each individual statement the declarant made that implicated the defendants was against the declarant's penal interest at the time that he made the statement. (*Ibid*.)

*Gallardo* is inapposite in this regard. In this case, the trial court admitted excerpts from a confidential informant's conversation with Boyd. The trial court held a hearing at which it considered each of the statements Boyd made that implicated Buchanan and his co-defendants, and heard argument from the parties regarding whether the statements should be admitted on an individualized basis. The process the trial court followed did not contravene *Gallardo*.[8]

---

[8] Although he cites to the hearing regarding the admissibility of Boyd's statements multiple times in the opening brief, Buchanan complains that the trial court did not hold a hearing. This is obviously incorrect. Buchanan also claims that the transcripts were admitted in their entirety. The record shows that the prosecution sought to admit only the portions of the conversation that had been presented to the grand jury, and the transcripts clearly indicate where one excerpt ends and the next begins.

*Self-Serving, Unreliable Statements*

Buchanan also relies on *Gallardo* to argue that the statements Boyd made to the confidential informant were "too "'self-serving and unreliable'" [citation] to qualify as declarations against his penal interest." (*Gallardo*, *supra*, 18 Cal.App.5th at p. 74.) In *Gallardo*, the court identified specific circumstances indicating a lack of reliability. The court found unreliable statements that followed questions by the confidential informants suggesting that something occurred or was a fact when that occurrence or fact had not been first introduced by the declarant. (*Id.* at p. 73.) For example, the informants asked the declarant if one of the defendants was the shooter, although the declarant had never stated that was the case. (*Ibid.*) The problem was compounded when the informants asked questions that led the declarant to contradict his earlier statements. (*Ibid.*) The statements became even more problematic when the confidential informants suggested the declarant's role was minimal, asked leading questions designed to shift the blame to the defendants, and elicited a response minimizing the declarant's role and shifting the blame to the defendants. (*Id.* at p. 74.) The *Gallardo* court emphasized that the declarant had already implicated himself as a participant in the crime in an unspecified capacity when he identified the defendants as the major participants, which "did little to increase [the declarant's] criminal culpability, and served primarily to 'minimize [his] role and place the blame . . . on [his] accomplice[s].' [Citation.]" (*Ibid.*)

Buchanan interprets *Gallardo* to hold that a statement is unreliable when the confidential informant asks a question or summarizes an event. This is not what *Gallardo* held. The

*Gallardo* court carefully analyzed the circumstances presented in that case and found the declarant's statements unreliable when prompted by a question by the informants that introduced a fact or event for the first time in the conversation, eliciting a response from the declarant that contradicted his earlier admissions and/or minimized his role in the crimes and shifted the blame to the defendants. Buchanan also argues a declarant's self-inculpatory statements that precede the declarant's statements regarding the defendant's culpability are unreliable. However, the order in which the declarant in *Gallardo* made his statements was not significant in isolation. It was significant because the declarant in *Gallardo* began by incriminating himself, but then identified the defendants as the central perpetrators of the crime and minimized his own involvement.

As we discuss *post*, in this case the exact opposite occurred. The confidential informant only mentioned facts and occurrences that Boyd had first introduced into the conversation, and summarized only occurrences that Boyd had previously described. Neither the informant nor Boyd attempted to minimize Boyd's role in any way. From the very start of the conversation Boyd implicated himself as a shooter who worked in concert with one other shooter—Buchanan. Boyd's statements remained consistent throughout the conversation. He did not attempt to shift blame for his own actions to others.

*Specific Statements*

Buchanan specifically challenges the admission of three portions of the transcript, which we address in turn:

First, Buchanan appeals from the trial court's admission of

an exchange between himself and Detective Hardiman followed by excerpts from a conversation between Buchanan and the confidential informant shortly after Detective Hardiman left the jail cell:

> "[Detective] Hardiman:  Hey, Jaidan, you and Kellz killed that boy from Inglewood Family.
> "Boyd:  I didn't kill nobody.
> "[Detective] Hardiman:  Okay.  You did it in front of a bunch of people, dude, okay.
> "Boyd:  I didn't do shit.
> "[Detective] Hardiman: There were a bunch of people there; Too Greedy Family, from a whole bunch of people, they saw it.
> "Boyd:  Guess what?  I ain't did shit.
> . . . [Detective Hardiman leaves the jail cell.]
> "U/C:  What happened homey?
> "Boyd:  They got me on video.
> . . .
> "U/C:  They got you on video smoking somebody?
> "Boyd:  Yea."
>
> . . .
>
> "Boyd: . . . *And I know somebody snitching for sure because they saying me and the nigga that really did it.  They saying we did it . . . They says you and Kellz killed him . . . He says, 'You and Kellz killed him.'''* (Italics added.)

Buchanan challenges the admission of the above

statements, arguing that Boyd implicated Buchanan after implicating himself, thereby shifting the blame to Buchanan. To make this argument, Buchanan selectively omits a portion of the conversation where Boyd told the confidential informant that at the time of the shooting he was with a large group of people, and that all of those people had been arrested. Boyd knew that someone had snitched on him because out of the numerous people who were in custody, the police had accused him of committing the shooting with Buchanan—who was, in fact, the only other shooter.

Further, the order in which statements are made may matter in context, but in and of itself, the fact that the speaker's inculpatory statement precedes a statement implicating the defendant does not have significance. Here, the fair reading of the transcript is that Boyd did not minimize his role or shift blame. He admitted that he committed the crime in concert with Buchanan, a fact that was against Boyd's own penal interest. (See *People v. Cervantes* (2004) 118 Cal.App.4th 162, 176 [statements that the defendant shot a man was against the declarant's interest because it showed that declarant was acting "in concert" with the shooter].) Buchanan also complains that, because Boyd had already admitted that he was a shooter, the statement was cumulative. However, Buchanan cites no precedent barring the use of statements against penal interest that contain cumulative evidence of the declarant's guilt, and he does not support the assertion with argument. Courts are not required to "sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant." (*Grimes*, *supra*, 1 Cal.5th at p. 716.)

Second, Buchanan objects to the following portions of

Boyd's conversation with the confidential informant:

>  "U/C:  So, do you think the nigga, uh, Kellz, you think he got caught with the burner?
>
>  "Boyd:  *Huh uh (negative).  Nobody got caught with the blower.  This is this is what happened.  The nigga Drakeo had the nigga Drakeo got like a distinctive car bro, like a car you can't miss, so all them bitches that were in the parking lot, I didn't know nobody was there, but the bitches that were in the parking [lot] knew cuh car.  So they caught Drakeo.  And when they caught Drakeo, they raided cuh house.  They found a gang of blowers, they found a Draco, they found an AK and all that but neither one of them was the blowers we used, you feel me? But, little regular, bro.  I wasn't there.*
>
>    . . .
>
>   "U/C:  So they going to say . . . AB and Kellz, man, was the shooters.
>
>  "Boyd:  *On wood, that's exactly how it went.  I know it is.  I know exactly how we did it, 40 Crip.*"
> (Italics added.)

Buchanan contends that these statements are unreliable because the informant was prompting Boyd for new information. As we have explained, the fact that the declarant is responding to a question does not render his response unreliable.  In *Gallardo*, the informants interjected new information into the conversation by way of their questions, and also suggested an answer that would minimize the declarant's role, which the declarant then

37

adopted. Here, the informant asked a question based on facts that Boyd had already introduced. Boyd did not disavow his role; he instead described what he knew about whether the guns were recovered.

Buchanan complains that Boyd's statement that Buchanan disposed of the gun he used was speculation. But Boyd did not state that Buchanan disposed of his gun; he stated that the police had not recovered the other gun, based on his knowledge that the gun had not been recovered when the police searched Drakeo's home or when they searched Buchanan. When the informant asked if Boyd knew whether Buchanan disposed of the gun, Boyd responded that he had not spoken to Buchanan about it. Boyd further implicated himself by demonstrating that he knew details of the police investigation. As with the other statements, it is irrelevant that this statement was made after Boyd had already incriminated himself in some other respects, because Boyd did not attempt to shift the blame to someone else.

Finally, Buchanan claims that the trial court was concerned about the statement that Gregory may have been shot in the head ("*He might've got shot in the head, though. I don't know.*"), because it implies that someone other than Boyd shot Gregory in the head. As is clear from the discussion at the hearing recounted above, the court did not view Boyd's statement as implicating someone else in the shooting or suggesting that someone else may have shot Gregory in the head. As the court interpreted the statement, Boyd admitted to shooting Gregory twice, and conceded that he may have shot Gregory in the head, but was not sure if he had.

The trial court's admission of the specific statements that Buchanan challenges under the exception for statements against

38

penal interest was not an abuse of discretion, nor was it a violation of his right to due process.[9] (See *Linton, supra,* 56 Cal.4th at p. 1202 [""'[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense.'"'"].)

*Coercion*

Buchanan alternatively argues that Boyd's statement was inadmissible because Boyd was young and felt pressure to comply with the confidential informant.[10] We reject the contention, as the record contains no suggestion that Boyd's statement was coerced.

"In *Miranda v. Arizona*[, (1966) 384 U.S. 436 (*Miranda*)],

---

[9] At oral argument, appellate counsel argued that the prejudice caused by admission of Boyd's statements was compounded by the trial court's refusal to instruct the jury under CALCRIM No. 335 that Boyd was an accomplice as a matter of law and his statements must be corroborated. This argument was mentioned in the opening brief in the context of compounding prejudice, but was not developed or supported by legal authority. As we have concluded that the trial court did not abuse its discretion, we need not reach arguments relating to prejudice. Regardless, our Supreme Court has held that where statements are properly admitted as statements against the declarant's interest, corroboration is not required, as such statements are sufficiently trustworthy to permit their admission into evidence despite the hearsay rule. (*People v. Brown* (2003) 31 Cal.4th 518, 555-556.)

[10] Boyd was 17 years old when he committed the offenses, but 18 years old when he spoke with the confidential informant.

the [Supreme] Court [of the United States] held that the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning. Custodial interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody. . . .' (*Id.* 384 U.S., at 444.)" (*Illinois v. Perkins* (1990) 496 U.S. 292, 296.) "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Id.* at p. 297.) "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. [Citations.] When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking. [Citation.] There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." (*Id.* at pp. 296–297.)

"Although a defendant lacks standing to complain about a violation of a third party's Fifth Amendment privilege against self-incrimination, a defendant does have standing to assert that a violation occurred of his or her own due process right to a fair trial because of an asserted violation of a third party's Fifth Amendment right. [Citation.]" (*People v. Clark* (2016) 63 Cal.4th 522, 580.) "'[However,] it is not enough for a defendant who seeks to exclude trial testimony of a third party to allege that coercion

40

was applied against the third party, producing an involuntary statement before trial.  In order to state a claim of violation of his own due process rights, a defendant must also allege that the pretrial coercion was such that it would actually affect the reliability of the evidence to be presented at trial.'  [Citation.]" (*Ibid*.)

Buchanan argues that Boyd's youth placed him at a disadvantage because youthful offenders have a "'limited understanding of the criminal justice system and the roles of the institutional actors within it.'"  This argument strikes at unfair play, but the issue here is whether the statements were reliable.  Buchanan's argument that, because of his youth, Boyd was less likely to understand that he was having a conversation with a confidential informant cuts against him in this context.  If Boyd was less likely to comprehend that the informant was gathering information about the crimes, he was more likely to be truthful.

Recognizing that it is likely Boyd believed he was speaking with a fellow gang member, Buchanan asserts that the informant intimidated Boyd into making incriminating statements by asking Boyd where he was from and what he was called.  Buchanan argues that the prosecution's expert witness testified that these questions were "absolutely a gang 'challenge[,]'" and that Boyd would feel compelled to elaborate because if he did not the informant would believe he was "a cooperator."  Buchanan distorts the record.  On the very page he cites, Detective Hardiman testified that, "in this context, it's a question."  The detective explained that the informant asked Boyd which gang he was from and then offered that he, too, was in a Crips gang—i.e. that they were aligned and not rivals.  There is simply nothing in the record to indicate that the informant was pressuring Boyd.

41

The questions the informant asked established a rapport between them, and encouraged Boyd to believe that he could speak freely with his cell mate.

### *III. Claims Related to Offenses That Occurred when Buchanan was Incarcerated (Dismissed Counts 13 and 34)*

Buchanan claims that the prosecution violated his constitutional rights under *Brady*, *supra*, 373 U.S. 83, by failing to disclose that he was incarcerated on January 9, 2015, when the crimes in counts 13 (attempted murder) and 34 (possession of a firearm by a felon) were allegedly committed. He further contends that the prosecution committed misconduct by failing to correct Detective Hardiman's false testimony that Ervin told him Buchanan shot Chad Jones on January 9, 2015, and by eliciting Detective Hardiman's false testimony that he believed the shooting occurred on a different date.

We conclude that there was no *Brady* error, as Buchanan was aware that he was incarcerated when Jones was shot in the hand. Buchanan forfeited his contentions that Detective Hardiman's testimony was not corrected and that the prosecution elicited false testimony, because he failed to object on either ground at trial, but even if Buchanan had preserved these issues for appeal, they are not supported by the record.

### **Proceedings**

The indictment charged Buchanan with the attempted murder of Chad Jones on January 9, 2015 (count 13), and with possession of a firearm by a felon on the same date (count 34). It

42

also charged Buchanan with two prior first degree burglary convictions sustained in July of 2013, which it alleged were prior strikes, prior serious felony convictions, and prison priors.

At trial, Ervin testified that he told Detective Hardiman that Buchanan told him about another shooting Buchanan committed. Buchanan told Ervin he had been riding through Inglewood when a car started chasing him. Buchanan shot at the car and hit the finger or hand of a member of the Inglewood Family Bloods who went by the moniker 7 Flame. The shooting occurred somewhere between Crenshaw and Manchester around August of 2016. Ervin also testified that when he first joined Too Greedy Family/STINCC Team in 2015 he did not see Buchanan at Darrell Caldwell's house because Buchanan was still incarcerated. Ervin thought Buchanan was released from prison at the end of 2015.

Officer Robert Swenson testified that he and his partner responded to a call reporting a shooting at 8005 South Van Ness Boulevard in Inglewood on January 9, 2015. When they arrived they discovered blood in a parking lot and bullet casings in an alley. There were no victims of the shooting at the scene.

Also on January 9, 2015, Officer Daniel Lee received a report of multiple shooting victims being treated at a hospital in Inglewood. One of the victims, Chad Jones, had been grazed by a bullet on his hand.

Detective Hardiman testified that Ervin told him that Buchanan said he shot Chad Jones in the hand on January 9, 2015, near Crenshaw and Manchester. The detective corroborated the information Ervin gave him by contacting the police agency with jurisdiction over the area in which the shooting occurred, and confirming that a crime matching the

43

circumstances as described by Ervin in fact occurred. In addition to the Jones shooting, Ervin provided Detective Hardiman with information about six other shootings. The detective was able to corroborate that there were in fact shootings matching all of the circumstances that Ervin described. Although Detective Hardiman attempted to discuss the shooting with Jones, Jones was not cooperative.

A few days after Detective Hardiman testified in the People's case-in-chief, Buchanan's counsel stated that he intended to call Detective Hardiman as a witness for the defense. After counsel had a discussion off the record, the prosecution informed the court that it had just received documents from the California Department of Corrections and Rehabilitation establishing that Buchanan was in custody at the time Chad Jones was alleged to have been shot. The prosecution requested additional time to question Detective Hardiman about the documents before he testified for the defense. Buchanan's counsel informed the court that he could delay questioning Detective Hardiman until the following day, as waiting "will not change what the facts are."

Buchanan's counsel called Detective Hardiman to the stand and confronted him with the fact that, in light of Buchanan's incarceration at the time, Buchanan could not have shot Jones on January 9, 2015, as charged. Detective Hardiman admitted that it was impossible for Buchanan to have shot Jones on the date alleged. The detective stated that he had made the mistake, not Ervin. He explained that Ervin told him the shooting occurred in July or August of 2016, but that he thought Ervin had gotten the date wrong, because the other facts were consistent with the shooting that occurred on January 9, 2015. Detective Hardiman

44

testified that he still believed the shooting happened, but on a different date. He had been able to corroborate the rest of the information Ervin gave him, and Buchanan had indicated in jail calls that he and Jones had been in some sort of altercation.[11]

On cross-examination, the prosecution elicited that, after learning Buchanan was in prison on January 9, 2015, Detective Hardiman contacted the Inglewood Police Department to see if there were other reports of Jones being shot. There were no reports of Jones being shot on a date other than January 9, 2015. Detective Hardiman testified that not all gang shootings are reported.

The charges in counts 13 and 34 were dismissed on the prosecution's motion, and the jury was instructed not to consider those counts.

## Failure to Disclose Exculpatory Evidence (*Brady* Error)

Buchanan first contends that the prosecution violated its constitutional duty to provide exculpatory evidence of which it knew or should have known, because it failed to disclose that Buchanan was incarcerated on January 9, 2015, and could not have shot Chad Jones or illegally possessed a firearm on that date, as alleged in counts 13 and 34, respectively.

---

[11] Several phone calls that Buchanan made from prison were recorded and played for the jury. He stated that 7 Flame was housed in the same prison and that he told 7 Flame he was going to fight with him, but that he was waiting for the right time. 7 Flame had fought with someone else and his hand was injured.

"Under the Fourteenth Amendment's due process clause, prosecutors must disclose evidence to a criminal defendant when it is "'both favorable to the defendant and material on either guilt or punishment."  [Citations.] Evidence is "favorable" if it hurts the prosecution or helps the defense.  [Citation.]  "Evidence is 'material' 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.""' (*People v. Earp* (1999) 20 Cal.4th 826, 866; see also *Brady*, *supra*, 373 U.S. at p. 87.)  Evidence probative of a testifying witness's credibility, including the potential for bias, is evidence favorable to the accused.  (See *United States v. Bagley* (1985) 473 U.S. 667, 676.)" (*People v. Morrison* (2004) 34 Cal.4th 698, 714 (*Morrison*).)

In this case, there is no question that, at the time of trial, Buchanan knew, and his counsel either knew or should have known, that Buchanan was in prison on January 9, 2015. ""[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim.' (*United States v. Brown* (5th Cir. 1980) 628 F.2d 471, 473; see also *United States v. Stuart* (8th Cir. 1998) 150 F.3d 935, 937 ['Evidence is not suppressed if the defendant has access to the evidence prior to trial by the exercise of reasonable diligence.']; *United States v. Slocum* (11th Cir. 1983) 708 F.2d 587, 599.)  In any event, evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery. (*United States v. Martinez–Mercado*, *supra*, 888 F.2d at p. 1488; see *United States v. Slocum*, *supra*, 708 F.2d at p. 600 [newly-discovered evidence does not warrant a new trial unless, inter

46

alia, the evidence is discovered *following* trial and the movant demonstrates due diligence to discover the evidence *prior* to trial].)"  (*Morrison*, *supra*, 34 Cal.4th at p. 715.)

### Failure to Correct False Testimony and Presentation of Additional False Testimony

Buchanan next argues that the prosecution committed misconduct when it failed to correct Detective Hardiman's testimony that Ervin told him Buchanan shot Jones in the hand on January 9, 2015, and then elicited his irrelevant testimony suggesting the shooting occurred on another date.  Buchanan forfeited both contentions by failing to raise the issues at trial.  "[H]is failure to make proper objections, request appropriate sanctions, or seek any continuance on the matter is fatal to his contentions on appeal.  (See *People v. Carpenter* (1997) 15 Cal.4th 312, 411 [*Brady* claim found not cognizable on appeal]; cf. *People v. Marshall* (1996) 13 Cal.4th 799, 830–831 [claim that conviction was based on false testimony found waived]; *People v. Arias* (1996) 13 Cal.4th 92, 151 [failure to seek sanctions or a continuance found fatal to claim that prosecutor had misled the defense concerning the content of a witness's testimony].)"  (*Morrison*, *supra*, 34 Cal.4th at p. 714.)  Regardless, both contentions are without merit.

"When the prosecution fails to correct testimony of a prosecution witness which it knows or should know is false and misleading, reversal is required if there is *any reasonable likelihood* the false testimony could have affected the judgment of the jury.  This standard is functionally equivalent to the "'harmless beyond a reasonable doubt'" standard of *Chapman v.*

*California* (1967) 386 U.S. 18. (*In re Jackson* (1992) 3 Cal.4th 578, 597–598.)" (*People v. Dickey* (2005) 35 Cal.4th 884, 909.)

In this case, the detective's false testimony was corrected at trial—Detective Hardiman repeatedly testified that he was mistaken and that Buchanan could not have shot Jones on January 9, 2015. Detective Hardiman also admitted that Ervin told him Buchanan shot 7 Flame in July or August of 2016, but that he testified the shooting occurred on January 9, 2015, because the other details of the shooting matched, and he assumed Ervin was mistaken about the date. Ervin, who testified before Detective Hardiman, consistently stated that Buchanan told him he shot 7 Flame in the hand in August of 2016, and that Buchanan was incarcerated in early 2015.

With respect to his contention that the prosecution elicited Detective Hardiman's false testimony that the shooting took place on a different date, Buchanan's representation of the record is inaccurate. Buchanan's counsel elicited Detective Hardiman's testimony that he believed there was another occasion on which Buchanan shot Jones. On cross-examination, the prosecutor questioned Detective Hardiman on the subject, which had already been broached by the defense.

Detective Hardiman conceded that there had been no other reported shootings in which 7 Flame was the victim, although some gang shootings are not reported. It was the jury's role to determine the plausibility and credibility of his statements.

Finally, Detective Hardiman's testimony was relevant because it reflected on both his credibility and Ervin's. The detective incorrectly testified that Buchanan committed the January 9, 2015 shooting. It was helpful for the jury to know why Detective Hardiman reached that erroneous conclusion and

48

that the detective was the source of the misinformation when evaluating whether to rely on Detective Hardiman's and/or Ervin's testimony. The prosecution did not violate Buchanan's constitutional rights by allowing false testimony to stand uncorrected or by eliciting highly implausible testimony that had no relation to the issues.

## IV. Exclusion of Evidence of Deputy Chavez's Alleged Past Misconduct

Buchanan next contends that the trial court abused its discretion by excluding evidence of alleged past misconduct of the testifying firearms examiner, Deputy Chavez, and violated the Confrontation Clause by impermissibly restricting the scope of cross-examination of the deputy. We conclude that the trial court's exclusion of evidence of past misconduct allegations was within its discretion. Buchanan did not move to impeach specific testimony by Deputy Chavez, and has therefore forfeited his challenge on that ground, made for the first time on appeal. Regardless, exclusion of evidence with marginal impeachment value under Evidence Code section 352 does not violate the Confrontation Clause.

### Legal Principles

"[T]he law provides that any criminal act or other misconduct involving moral turpitude suggests a willingness to lie and is not necessarily irrelevant or inadmissible for impeachment purposes. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295–296 (*Wheeler*); see *id*. at pp. 297–299 [misdemeanor

conviction itself is inadmissible over a hearsay objection to prove misconduct bearing on credibility]; see also Cal. Const., art. I, § 28, subd. (f)(2) (truth–in–evidence provision).) However, to the extent such misconduct amounts to a misdemeanor or is not criminal in nature, it carries less weight in proving lax moral character and dishonesty than does either an act or conviction involving a felony. (*Wheeler*, *supra*, 4 Cal.4th at p. 296; see Evid. Code, § 788 [authorizing prior felony convictions for impeachment].) Hence, trial courts have broad discretion to exclude impeachment evidence other than felony convictions where such evidence might involve undue time, confusion, or prejudice. (*Wheeler*, *supra*, 4 Cal.4th at pp. 296–297; accord, *People v. Lightsey* (2012) 54 Cal.4th 668, 714; *People v. Clark* (2011) 52 Cal.4th 856, 931–932.)" (*People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24 (*Contreras*).)

"[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues. . . . [¶] When exercising its discretion under Evidence Code section 352, a court must always take into account, as applicable, those factors traditionally deemed pertinent in this area. [Citations.] But additional considerations may apply when evidence other than felony convictions is offered for impeachment. In general, a misdemeanor—or any other conduct not amounting to a felony— is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular

care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler*, *supra*, 4 Cal.4th at pp. 296–297, fn. omitted.) "[I]mpeaching misconduct now may, and sometimes must, be proven by direct evidence of the acts committed. These acts might not even constitute criminal offenses. Under such circumstances, fairness, efficiency, and moral turpitude become more complicated issues. Courts may take these facts into account when deciding under Evidence Code section 352 whether to admit evidence other than felony convictions for impeachment." (*Id.* at p. 297, fn. 7.)

"Cross-examination is subject to restriction under Evidence Code section 352 if it is cumulative or if it constitutes impeachment on collateral issues. (*People v. Mincey* (1992) 2 Cal.4th 408, 439–440; *People v. Morse* (1992) 2 Cal.App.4th 620, 641–642.) The trial court's wide discretion under Evidence Code section 352 to limit cross-examination is not abused by the exclusion of impeachment evidence which has only marginal probative value. (*Wheeler*, *supra*, 4 Cal.4th 284, 295–296; *People v. Dyer* (1988) 45 Cal.3d 26, 48; *People v. Bento* (1998) 65 Cal.App.4th 179, 195.) 'Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination.' (*People v. Brown*[ (2003)] 31 Cal.4th 518, 545.)" (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 122 (*Ardoin*) disapproved of on another ground by *People v. Dalton* (2019) 7 Cal.5th 166 (*Dalton*).)

51

## **Proceedings**

Before trial, the prosecution sought to exclude prior allegations against Deputy Ivan Chavez that had been presented to the grand jury. Deputy Chavez had been employed by the Los Angeles Sheriff's Department (LASD) for 29 years, and began working in the crime lab in 2007. The deputy performed the firearms analysis in this case, and his work had been reviewed and confirmed by other firearms experts.

The prosecution had previously disclosed "out of an abundance of caution" several remote prior allegations against Deputy Chavez relating to dishonesty. The allegations included a claim that Deputy Chavez committed perjury during a preliminary hearing in 1998, made false statements in an LASD internal investigation involving complaints of excessive force and false reporting in 2003, and sexually abused his sister-in-law between 1988 and 1990. The alleged sexual abuse was reported in 2013.

At a hearing on the matter, the prosecution argued that admission of the prior allegations would result in "a trial within a trial" given the age of the allegations, lack of supporting evidence, the absence of findings, and the fact that the allegations did not result in criminal charges. With respect to the 2003 allegation of false statements, Deputy Chavez was briefly discharged from his position with LASD, but later reinstated.

The court asked the defense attorneys whether they intended to use the allegations as impeachment. Buchanan's counsel stated that he had not made a final determination, but that he believed the allegations should be "in play" for impeachment purposes.

The prosecutor asked for an immediate ruling. She argued that the allegations were prejudicial and should be excluded. If the court ruled them admissible, she would not call Deputy Chavez to the stand but would instead call witnesses who had reviewed the deputy's work. Deputy Chavez conducted all of the firearms analysis, and various experts confirmed his findings. The People could either call Deputy Chavez or five or six other experts.

The prosecutor agreed to provide all information regarding the allegations, but advised the court that it comprised only a few pages. She requested that any information be subject to a protective order because the information was akin to that sought in a *Pitchess* motion.[12] The court instructed the prosecutor to turn over all the information in her possession to the court and defense counsel, subject to a protective order that the information could be used only in connection with the present case.

Subsequently, the prosecutor asked the trial court to review the documents in camera, as they included attorney work product. The court held an in camera hearing, and discussed the issue with the parties afterward. The in camera review revealed the following: The allegation of sexual abuse was reported 25 years after the alleged abuse took place, and no charges were filed. The allegation of perjury in a preliminary hearing in 1998 was presented to the District Attorney's office and rejected. Finally, although Deputy Chavez had been discharged in 2003 for making false statements during an internal investigation involving complaints of excessive force and false reporting, he was reinstated following an appeal to the Civil Service

---

[12] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

Commission in 2004. The allegation was reviewed by the District Attorney's office, which determined there was insufficient evidence to file charges. The Sheriff's Department had purged all records regarding the alleged false statements due to their age in the normal course of business.

The trial court ruled that the remote allegations, which variously did not lead to a criminal filing, a civil filing, and resulted in reinstatement, would not be admitted. The court stated: "It's 16 years ago. Had there been other more recent issues, I think you would have a better argument. But it's to question [Deputy Chavez] based on what ifs. There are no police reports. It has been purged from the file. [¶] So at this time it would just be a fishing expedition for which the defense, at this point, couldn't even corroborate without any file. So whatever answer [Deputy Chavez] gave, you will be stuck with. I think it is completely irrelevant. It's been 16 years. There have been no other allegations based on the prosecution's research of [Deputy Chavez] since the most recent in 2003. [¶] We're not going to have a semi trial within this trial. The court has deemed, due to the passage of time, due to the fact that there's been no recent allegations since the 16-year-old allegation, for which the District Attorney's office declined to file, for which [Deputy Chavez] administratively was rehired back and there's been no allegations since then, that it is irrelevant to this particular case."

In testimony before the jury, Detective Chavez stated he had been a Deputy Sheriff for 29 years. On cross-examination, Darrell Caldwell's counsel inquired whether Deputy Chavez had worked as a Deputy Sheriff continuously for 29 years, and the deputy confirmed that he had. The following day, outside the presence of the jury, Darrell Caldwell's counsel stated that he

believed Deputy Chavez lied when he stated that he had worked for LASD continuously for 29 years, because the deputy had been fired in 2003, and reinstated in 2004.

The prosecutor responded that, although she was not certain, she believed that a person is viewed as having worked during the period of suspension if reinstated. Reinstatement is an admission that the decision was incorrect, so the person's prior status is restored. The prosecutor further argued that the issue was irrelevant to the case.

Darrell Caldwell's counsel responded that the prosecution elicited that Deputy Chavez worked for LASD for 29 years, which bolstered his credibility. The defense was entitled to question Deputy Chavez on an issue raised in direct examination.

Buchanan's counsel did not join in counsel's objections.

The trial court ruled that the defense could not cross-examine Deputy Chavez on the issue. The court's understanding of reinstatement (with which Darrell Caldwell's other counsel concurred) was consistent with the prosecution's understanding, and even if that were incorrect, the issue was irrelevant.

### Analysis

Here, the 16-year-old allegations were extremely remote, which created serious issues of proof. There were minimal records still in existence, so it would be necessary for the defense to call witnesses to the alleged incidents, who could be difficult to locate, or possibly deceased. (*Wheeler, supra*, 4 Cal.4th at p. 296, fn. 7 [in the absence of a conviction impeaching conduct may require proof by direct evidence].) Any recall the witnesses may have had would likely be degraded by the passage of time. As the

55

trial court noted, proof of the allegations would require "a semi trial within this trial", and devotion of time to collateral, potentially confusing, matters within already lengthy proceedings. The age of the allegations also diminished their probative value. Even if Deputy Chavez had been dishonest in the past, there was no evidence of dishonesty in the 16 years preceding the trial.

Furthermore, the probative value of the proffered evidence here was diminished because of the lack of a conviction, charges, and sustained employment consequences. (See *Contreras*, *supra*, 58 Cal.4th at p. 157 [prior misconduct that does not result in a felony conviction carries less probative value].) The District Attorney had deemed the evidence underlying the allegations of sexual abuse and perjury insufficient to warrant charges, and the Civil Service Commission had reinstated Deputy Chavez following the false statement allegations.

In sum, the allegations had only limited probative value, and would have required evidence on collateral matters that could have been time consuming and confusing to the jury. The trial court acted within its discretion when it ruled the prior allegations against Deputy Chavez inadmissible under Evidence Code section 352. (See *Wheeler*, *supra*, 4 Cal.4th at pp. 296–297 [trial court has broad discretion to exclude evidence of prior misconduct for impeachment purposes].)

Buchanan's contention that the exclusion of evidence impinged on his right to confront witnesses lacks merit. Counsel made no request to confront Deputy Chavez with prior acts evidence regarding the testimony of which he now complains, and therefore forfeited that challenge on appeal. (*People v. Redd* (2010) 48 Cal.4th 691, 730 [failure to raise an objection below

56

based upon the confrontation clause forfeits claim on appeal].)
Regardless, the court had discretion to prohibit the defense from
impeaching Deputy Chavez on collateral issues. (*Ardoin, supra,*
196 Cal.App.4th at p. 122.) The trial court's exclusion of evidence
of prior alleged misconduct that had only marginal probative
value and would entail undue consumption of time did not violate
Buchanan's constitutional right to confront witnesses.[13] (*Ibid.*)

## *V. Kellet Error*

Buchanan argues that the charges for possession of a
firearm by a felon in counts 28 through 31 were barred under
*Kellet, supra,* 63 Cal.2d 822, at page 827, which held that "When .
. . the prosecution is or should be aware of more than one offense
in which the same act or course of conduct plays a significant
part, all such offenses must be prosecuted in a single proceeding
unless joinder is prohibited or severance permitted for good
cause. Failure to unite all such offenses will result in a bar to
subsequent prosecution of any offense omitted if the initial
proceedings culminate in either acquittal or conviction and
sentence." Buchanan contends that he pleaded no contest to
possession of a firearm by a felon in a prior case, in which he was
charged with possessing the same firearms, which barred the
prosecution from filing the possession of a firearm by a felon
charges in this case. The prosecution explained that the charges

---

[13] Buchanan's claims that the trial court prohibited him
from cross-examining Deputy Chavez and limited his attack on
the deputy's credibility to the presentation of a competing expert
witness are not supported by the record.

in the other case related to possession of different firearms on separate occasions.  The trial court ruled in the prosecution's favor.

Even if we were to assume the prosecution committed *Kellet* error, Buchanan was not prejudiced.  The trial court struck counts 28 through 31 and all associated allegations at the sentencing hearing pursuant to section 1385 at the prosecution's request.  (See § 1385, subd. (a) ["The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed"].)

## VI. Sufficiency of the Evidence

Buchanan contends that the evidence was insufficient to support his convictions related to the shootings that occurred on December 10, 2016.  Buchanan's challenge amounts to an attack on the credibility of Ervin's testimony and the reliability of Boyd's statement to the confidential informant, and the corroborating forensic evidence.  We reject these challenges as impermissible attempts to persuade us to evaluate witness credibility and re-weigh the evidence, which we will not entertain on appeal.

When reviewing for sufficiency of the evidence, we consider "'"'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"'  [Citation.]" (*People v. Casares* (2016) 62 Cal.4th 808, 823 (*Casares*), disapproved of on another ground in *Dalton*, *supra*, 7 Cal.5th at

58

p. 214; *People v. Clark* (2011) 52 Cal.4th 856, 942–943.) "As a general matter, juries may accept some parts of a witness's testimony and reject other parts . . . ." (*People v. Collins* (2021) 65 Cal.App.5th 333, 345.) "'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' [Citations.]" (*People v. Brown* (2014) 59 Cal.4th 86, 106.) "'. . . [I]t is the jury rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt.' [Citation.]" (*Casares*, *supra*, at p. 823.) "Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

Here, the People presented substantial evidence to establish Buchanan's guilt. As we have discussed, Boyd's statements to the confidential informant were against his penal interest and therefore reliable and admissible. Boyd identified himself and Buchanan as the shooters. He identified the gun that Buchanan shot as "a .40 or something." The ballistics evidence that the prosecution presented was consistent with Boyd's statements. Bullet casings recovered from the scene were determined to have been fired from the same .40 caliber Glock pistol that Buchanan was holding in a video filmed approximately two months before the shooting (verified by the pistol's serial number). A video taken approximately 16 days prior to the shooting depicted Buchanan with a .40 caliber Glock

pistol, as did a third video that was posted to Buchanan's Facebook page a month after the shooting. The third video included written comments that a member of the Inglewood Family Gangsters had been killed, and a person in the video mentioned "Red Bull," the moniker of victim Gregory. Boyd's statements to the confidential informant were amply supported by other evidence presented to the jury.

Ervin testified that on the night of the shootings he went to the party in the same car as Buchanan, who sat directly behind him in the passenger side back seat. Ervin ducked when he heard gunfire. Although he did not see Buchanan fire a gun, immediately afterward, Buchanan, who was holding a firearm, stated, "I emptied the clip on the nigga." Later, Ervin saw Buchanan drinking on social media. Buchanan said that he was "sipping on some dead bull," another play on Gregory's gang moniker, "Red Bull." On another occasion, Ervin heard Buchanan say that anyone who talked about the shootings would be killed. In jail, Buchanan told Ervin, "If you basically don't say anything, we're gonna be okay." Ervin's testimony was consistent with Boyd's statement. Substantial evidence supports Buchanan's convictions related to the December 10, 2016 shootings.

## VII. Assembly Bill 333

The jury found true the allegations that (1) Buchanan intentionally killed Gregory while Buchanan was an active participant in a criminal street gang (§ 190.2, subd. (a)(22)), (2) Buchanan committed the offenses in counts 3 through 9 at the direction of, in association with, or for the benefit of a criminal

60

street gang (§ 186.22, subd. (b)(1)(C)), and (3) a principal discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b)–(d), (e)(1)) in counts 3, 4, 5 and 6.

Assembly Bill 333 became effective on January 1, 2022, after briefing had concluded in this case, but while Buchanan's appeal was still pending with this court. The legislation amends section 186.22 and adds section 1109 to the Penal Code. As relevant here, the amendments to section 186.22 impose new elements to prove a gang enhancement under subdivision (b) of the statute. These new elements, in turn, also result in the imposition of additional elements to prove gang participation special circumstance findings (§ 190.2, subd. (a)(22)), and gang-related firearm use enhancements (§ 12022.53, subd. (e)). (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346–347 (*Lopez*).) Newly enacted section 1109 provides for bifurcation at trial, upon the defendant's request, of gang enhancement allegations from the underlying offenses. (§ 1109, subd. (a).) Neither amended section 186.22 nor new section 1109 states whether the recently enacted laws apply retroactively to cases pending on appeal. In light of the jury's findings, we invited the parties to file supplemental briefing on the impact of Assembly Bill 333 in this case.

### Amendments to Section 186.22

Section 186.22 provides for enhanced punishment when the defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22,

61

subd. (b)(1).)  Prior to the amendments made by Assembly Bill 333, to prove that a group was a "criminal street gang" the prosecution was required to show: "(1) the group [was] an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities [was] the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members . . . have engaged in, a pattern of criminal gang activity." (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 581; former § 186.22, subd. (f).) Former section 186.22, subdivision (e), provided that a "'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . ."   "Thus, 'the requisite "pattern of criminal gang activity" [[could] be proved] by evidence of "two or more" predicate offenses committed "on separate occasions" *or* by evidence of such offenses committed "by two or more persons" on the same occasion.' [Citation.]  '[A] predicate offense [could] be established by evidence of the charged offense.' [Citation.]" (*Menifee v. Superior Court of Santa Clara County* (2020) 57 Cal.App.5th 343, 362.)

Assembly Bill 333 amended section 186.22 in several fundamental ways.  The term "criminal street gang" has been redefined under section 186.22, subdivision (f) to mean "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary

activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity."  (Italics added.)

To prove a "pattern of criminal gang activity" as defined in subdivision (e)(1), under the amended law: (1) the last of the predicate offenses used to demonstrate a pattern of criminal activity must have occurred within three years of the date the current offense is alleged to have been committed; (2) the predicate offenses must have been committed by two or more gang members; (3) the predicate offenses must have commonly benefitted a criminal street gang; and (4) the common benefit of the predicate offenses must be more than reputational.  Certain crimes that previously qualified as predicate offenses may no longer be used to demonstrate a pattern of criminal activity. (§ 186.22, subd. (e)(1).)  The prosecution is prohibited from using the currently charged offense to establish a pattern of criminal activity.  (§ 186.22, subd. (e)(2).)

Finally, subdivision (g) of section 186.22 defines "to benefit, promote, further, or assist" a criminal street gang to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational," which may include "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  Previously, proof of a reputational benefit to the gang would suffice.  (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819.)

Although Assembly Bill 333 does not directly address either gang participation special circumstance findings (§ 190.2, subd.

(a)(22)) or gang-related firearm use enhancements (§ 12022.53, subd. (e)), the special circumstance allegation and enhancement incorporate concepts defined in section 186.22 in their elements. Section 190.2, subdivision (a)(22), requires that the prosecution prove, beyond a reasonable doubt that "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." Under section 12022.53, subdivision (e), firearm use enhancements imposed under subdivisions (b)–(d) may be imposed on the defendant for gun use by a principle if the defendant violated subdivision (b) of section 186.22. (§ 12022.53, subd. (e)(1).) As we discussed, "criminal street gang," "pattern of criminal activity," and what it means to "further the activities" of a criminal street gang—which must be proven to impose a special circumstance allegation under section 190.2, subdivision (a)(22), and section 12022.53, subdivision (e)— have all undergone significant substantive changes following the enactment of Assembly Bill 333. The amendments to section 186.22 necessarily alter the elements of proof for gang participation special circumstances and gang-related firearm use enhancements.[14] (See *Lopez*, *supra*, 73 Cal.App.5th at p. 346–348.)

*Retroactivity*

Amended section 186.22 does not specify whether the

---

[14] The People did not address the effect of Assembly Bill 333 on the gang participation special circumstance or the gang-related firearm use enhancements in their supplemental briefing.

changes to the statute apply retroactively to cases still pending on appeal.  We agree with the parties that they do.  Recently, the Court of Appeal, Second District, Division Eight held that the amendments Assembly Bill 333 made to section 186.22 are retroactive to non-final judgments:  " 'In *In re Estrada* (1965) 63 Cal.2d 740, 744–746 [(*Estrada*)], the California Supreme Court held that, absent evidence to the contrary, the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date.  (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307–308; *People v. Brown* (2012) 54 Cal.4th 314, 323.)  This principle also applies when an enhancement has been amended to redefine to an appellant's benefit the conduct subject to the enhancement.  (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 68, 70–71 (*Figueroa*).) . . . Assembly Bill 333 increases the threshold for conviction of the section 186.22 offense and the imposition of the enhancement . . . '[A] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to pending case[s].'  (*Id*. at p. 68.)"  (See *Lopez, supra*, 73 Cal.App.5th at pp. 343–344.)  We agree with the appellate court's reasoning and hold that the amendments Assembly Bill 333 made to section 186.22 are retroactive.

### *Necessity for Remand*

Although the parties agree that the amendments to section 186.22 apply retroactively, they disagree regarding whether the

65

issue is subject to harmless error analysis, and thus disagree as to whether the case must be remanded to the trial court for further proceedings.  Buchanan relies on *Lopez*, *supra*, 73 Cal.App.5th 327, in which the court, citing *People v. Ramos* (2016) 244 Cal.App.4th 99, 104 (*Ramos*), and *People v. Figueroa* (1993) 20 Cal.App.4th 71 (*Figueroa*), held that the defendant had a constitutional right to a jury trial on every element of the charged gang enhancement.  (*Id*. at p. 346.)  To the extent that Buchanan is arguing that the omission of an element of an offense may never be subject to harmless error analysis, he is incorrect.  The Court of Appeal, Second District, Division One has applied the harmless beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 in this exact context.  (*People v. Sek* (2022) 74 Cal.App.5th 657, 668–670 (*Sek*).)  Our Supreme Court has held that a trial court's failure to instruct on elements of robbery was harmless when the only issue the defendant contested was identity.  (*People v. Merritt* (2017) 2 Cal.5th 819; see also *People v. Mil* (2012) 53 Cal.4th 400, 411 ["[w]here an instruction omits some elements of the offense or allegation, but the elements were uncontested and supported by overwhelming evidence, it would not necessarily follow that the trial was fundamentally unfair or an unreliable vehicle for determining guilt or innocence"].)

Moreover, neither *Lopez* nor the cases *Lopez* cites address whether harmless error analysis is appropriate when an element of an offense has not been submitted to the jury.  In *Lopez*, the People argued that "the omission of proof that the predicate offenses commonly benefitted a criminal street gang in a way that was more than reputational was harmless."  (*Lopez*, *supra*, 73 Cal.App.5th at p. 346.)  The appellate court rejected the

66

argument because the evidence that the People relied upon to demonstrate harmlessness was never presented to the jury. (*Ibid*.)  The *Lopez* court did not discuss whether the error was harmless or structural.  (*Ibid*.)  In *Ramos*, the Court of Appeal held that it need not decide the proper rubric for assessing the error because, in that case, the omission of an element of the offense could not be deemed harmless beyond a reasonable doubt even if that standard applied.  (*Ramos*, *supra*, 244 Cal.App.4th at p. 104.)  Finally, in *Figueroa*, the People argued that the court could take judicial notice of facts outside the record to establish an element of the offense that had been added by subsequent legislation, or alternatively, that the court could rely on evidence presented at the preliminary hearing.  (*Figueroa*, *supra*, 20 Cal.App.4th at p. 71.)  The court declined to rely on evidence that was not presented at trial to establish an element of the offense. (*Ibid*.)  The court did not discuss whether the error was harmless or structural.  (*Ibid*.)

Here, we need not decide whether the error was structural or subject to harmless error analysis, because even if viewed under the *Chapman* lens, it could not be deemed harmless.  As Buchanan argues in his supplemental briefing, the prosecution used several of the offenses charged in this very case as predicate offenses.  The jury may have relied upon those charged offenses to establish the pattern of criminal activity, and we have no way of determining whether those currently charged offenses were the basis for the jury's true findings.  "To rule that the existence of evidence in the record that would permit a jury to make a particular finding means that the jury need not actually be asked to make that finding would usurp the jury's role and violate [Buchanan's] right to a jury trial on all the elements of the

67

charged allegations." (*Lopez, supra*, 73 Cal.App.5th at p. 346.) We decline to do so.

Even if we were inclined to rely on the other evidence of prior offenses that was presented to the jury, we could not do so because those offenses do not fall within the time period for predicate offenses set forth in the amended statute. The People contend that the last predicate offense used to demonstrate a pattern of criminal gang activity occurred within three years of the current offenses, citing to Darrell Caldwell's commission of felon with a firearm in January 2017. The charged offenses occurred in December 2016, however. It is well-established that crimes committed after the charged offense cannot serve as predicate offenses. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1458.) The Legislature has given no indication that it intended to dispense with this requirement through the amendments to section 186.22, and the People make no argument that the statutory language is amenable to such an interpretation.

The People argue that, although Detective Hardiman testified that Too Greedy realized reputational benefits from the current offenses, he also testified that Too Greedy benefitted from its prior robberies, which conferred financial benefits. While this might be sufficient to establish the "benefitted" prong of the definition of pattern of criminal activity to establish that Too Greedy was a criminal street gang (an issue we do not decide), it fails to address the requirement that the current offenses be committed to benefit the gang in a manner other than reputational. Section 186.22 now, and always, has required that the *current* offense was committed to benefit a gang. (§ 186.22, subd. (b)(1).) It is irrelevant that the gang produced revenue through prior robberies if the only benefit of the murder and

68

other current offenses to the gang was reputational.  The People have not demonstrated that Buchanan committed the crimes charged in the instant prosecution "for the benefit of" a criminal street gang.

The prosecution also failed to show that Buchanan committed the crimes "in association with" a criminal street gang under the amended laws.  To prove that Too Greedy was a criminal street gang, an issue that was hotly contested at trial, the prosecution would have had to sufficiently establish a pattern of criminal activity, which, as we have already discussed, it did not do.  It is not sufficient that Buchanan committed the shootings in association with another member of Too Greedy absent sufficient evidence that Too Greedy was the gang that both sought to benefit.[15]

In light of the numerous deficiencies of proof, we would not hold the errors harmless under any standard.  We vacate the special circumstance finding that Buchanan was an active participant in a criminal street gang when he committed the murder (§ 190.2, subd. (a)(22)), the gang enhancement allegation findings under section 186.22, and the gang-related firearm enhancement findings under section 12022.53, subdivision (e).

Buchanan argues that if we vacate the jury's gang-related findings, we must also reverse his convictions relating to the December 10, 2016 shootings because "[b]ut for the gang evidence, there would be no reasonable possibility that the jury could have believed that Mr. Buchanan fired the shots that were the basis for all of the convictions other than the charges in

---

[15] The People do not argue that the prosecution established that Buchanan committed the crimes "at the direction of" a criminal street gang.

counts 28-32 . . . ." We disagree. The elements of the December 10, 2016 offenses have not been impacted by the amendments to section 186.22. Buchanan is incorrect to assume that none of the gang evidence would be admissible to prove those offenses. Assembly Bill 333 does not bar the admission of gang evidence related to the underlying charges. Regardless, as we discussed in Section VI, substantial evidence supports Buchanan's convictions for the December 10, 2016 crimes. Buchanan has provided no precedent for his assumption that the evidence detailed in Section VI would be inadmissible under the amended laws. We affirm Buchanan's convictions.

"'Because we do not reverse [the special circumstance and enhancements] based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial. [Citations.] "'Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove [the additional] element[s] is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence.' [Citation.]" [Citation.]' [Citations.]" (*Sek*, *supra*, 74 Cal.App.5th at pp. 669–670.) We remand the matter to the trial court to permit the People to elect to retry the special circumstance and enhancements or, if the People do not elect to do so, for the court to proceed with resentencing Buchanan in conformance with this opinion.

### Section 1109

As relevant to Buchanan's case, new section 1109 provides

that, upon the defendant's request, the trial court must bifurcate an enhancement charged under section 186.22, subdivision (b) from the underlying charges, and hold separate proceedings, with the defendant's guilt in the underlying offenses determined first and the truth of any gang enhancements determined only after guilt has been established.  (§ 1109, subd. (a).)  The statute is silent as to whether it applies retroactively, or prospectively only.

Buchanan contends that section 1109 applies retroactively to his case under the rule articulated in *Estrada*, *supra*, 63 Cal.2d 740, that absent evidence to the contrary, the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date.  The People respond that section 1109 operates prospectively.  Citing to *People v. Cervantes* (2020) 55 Cal.App.5th 927 (*Cervantes*), and *People v. Sandee* (2017) 15 Cal.App.5th 294 (*Sandee*), the People assert that *Estrada* is inapplicable to section 1109, because the statute is procedural and does not convey a substantive benefit.  Buchanan counters that, unlike the legislation at issue in *Cervantes* and *Sandee*, the benefits that section 1109 creates for defendants are substantive as well as procedural.

"'No part of the Penal Code "is retroactive, unless expressly so declared."  (§ 3.)  "[T]he language of section 3 erects a strong presumption of prospective operation, codifying the principle that, 'in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the [lawmakers] . . . must have intended a retroactive application.'  [Citations.]  Accordingly, "'a statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective."'"'  ([*People v.*]

*Buycks*[ (2018)] 5 Cal.5th [857,] 880 [(*Buycks*)].)

"Despite the foregoing, a 'limited rule of retroactivity' applies to newly enacted criminal statutes that are intended to ameliorate criminal punishment. (*Buycks*, *supra*, 5 Cal.5th at p. 881 [discussing [ ]*Estrada*[, *supra*,] 63 Cal.2d 740].) 'The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, "a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not."' (*Buycks*, at p. 881.)" (*Cervantes, supra,* 55 Cal.App.5th at pp. 937–938.)

In *Cervantes*, the court rejected the defendant's argument that amendments to section 859.5, which was silent on the issue, were retroactive. The *Cervantes* court emphasized, "Ultimately, the applicability of the *Estrada* rule to a particular legislative change depends on whether the statute at issue is '"analogous" to the *Estrada* situation' and whether the logic of *Estrada* applies. [Citation.]" (*Cervantes*, *supra*, 55 Cal.App.5th at p. 940.) "The 2017 amendments to section 859.5 are not analogous to the statute at issue in *Estrada*. To the contrary, their effect is to impose requirements on certain interrogations, and to circumscribe the admissibility of those statements if those requirements are not met or excused. . . . The amendments do not . . . alter the substantive requirements for conviction, nor affect the available punishments in the event of conviction. They do not alter or reduce criminal punishment or treatment." (*Ibid.*, fn. omitted.)

In *Sandee*, the court rejected the defendant's argument that a law enforcement search of her cell phone violated the

72

Electronic Communications Privacy Act (Pen. Code, § 1546 et seq.) (ECPA), which became effective after the challenged search was conducted. (*Sandee*, *supra*, 15 Cal.App.5th at p. 304.) The court held that *Estrada* did not apply, because ECPA did not lessen the punishment for a crime, decriminalize conduct, or expand criminal defenses. (*Id*. at p. 305, fn. 7.)

Buchanan likens section 1109 to the legislation at issue in *Lara*, *supra*, 4 Cal. 5th 299, in which the Supreme Court held that Proposition 57's provisions regarding juvenile transfer hearings applied retroactively to cases filed in adult court before the proposition took effect. (*Id*. at p. 305.) The *Lara* court explained, "Proposition 57 prohibits prosecutors from charging juveniles with crimes directly in adult court. Instead, they must commence the action in juvenile court. If the prosecution wishes to try the juvenile as an adult, the juvenile court must conduct . . . a 'transfer hearing' to determine whether the matter should remain in juvenile court or be transferred to adult court. Only if the juvenile court transfers the matter to adult court can the juvenile be tried and sentenced as an adult. (See Welf. & Inst. Code, § 707, subd. (a).)" (*Id*. at p. 303, fn. omitted.) "The possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment. Therefore, Proposition 57 reduces the possible punishment for a class of persons, namely juveniles. For this reason, *Estrada's* inference of retroactivity applies." (*Id*. at p. 303.)

We agree with Buchanan that section 1109 does not bear a superficial likeness to the statutes discussed in *Cervantes* and *Sandee*. However, the conclusion in those cases that *Estrada* was

73

inapplicable because the legislation at issue did not alter the substantive requirements for conviction, lessen punishment, decriminalize conduct, or expand criminal defenses, is equally applicable here. Section 1109 does not reduce punishment or create a possibility of reduced punishment for a class of persons as Proposition 57 does. The statute alters the procedure for sequencing the portions of a trial relating to substantive crimes and gang enhancements. Significantly, the bifurcated portions of the trial remain before the same tribunal and the same trier-of-fact.[16] Moreover, section 1109 does not alter the punishment for

_____

[16] The impact of section 1109 is not at all like the impact of Proposition 57, addressed in *Lara*. Proposition 57 dramatically changed the possibility that an individual will be tried in juvenile court, where rehabilitation and more lenient treatment are express goals. "'A "juvenile court" is a separate, civil division of the superior court. (§ 246.) A prosecutor charges a minor with an offense by filing a juvenile petition, rather than a criminal complaint. (See §§ 653.7, 655.) Minors "admit" or "deny" an offense, rather than plead "guilty" or "not guilty." (§ 702.3.) There are no "trials," per se, in juvenile court, rather there is a "jurisdictional hearing" presided over by a juvenile court judge. (§ 602.) The jurisdictional hearing is equivalent to a "bench trial" in a criminal court. (See Cal. Rules of Court, rule 5.780.) Although a juvenile court judge adjudicates alleged law violations, there are no "conviction[s]" in juvenile court. (§ 203.) Rather, the juvenile court determines—under the familiar beyond the reasonable doubt standard and under the ordinary rules of evidence—whether the allegations are "true" and if the minor comes within its jurisdiction. (See § 602 et seq.)'

"'There is no "sentence," per se, in juvenile court. Rather, a judge can impose a wide variety of rehabilitation alternatives after conducting a "dispositional hearing," which is equivalent to a sentencing hearing in a criminal court. (§ 725.5; *In re Devin*

gang-related special circumstances or enhancements, let alone alter the punishment for any of the underlying offenses charged in a case. Section 1109 does not change the elements of any crime. For all of these reasons, Buchanan cannot overcome the strong presumption set forth in section 3 that section 1109 operates prospectively and is not applicable to his case. (*See Cervantes*, 55 Cal.App.5th at p. 941.)

## DISPOSITION

We affirm the convictions. The firearms enhancements imposed for Buchanan's personal firearm use under section 12022.53, subdivision (d) in counts 3, 5, and 6, and imposed and stayed in count 4, remain intact. We vacate the special circumstance finding that Buchanan was an active participant in a criminal street gang when he committed the murder in count 1 (§ 190.2, subd. (a)(22)), the gang enhancement allegation findings under section 186.22, subdivision (b) in counts 3 through 9, and

---

*J.* (1984) 155 Cal.App.3d 1096, 1100.) In the more serious cases, a juvenile court can 'commit' a minor to juvenile hall or to the Division of Juvenile Justice (DJJ), formerly known as the California Youth Authority (CYA). In order to commit a minor to the DJJ, the record must show that less restrictive alternatives would be ineffective or inappropriate. (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576.) The DJJ, rather than the court, sets a parole consideration date. DJJ commitments can range from one year or less for nonserious offenses, and up to seven years for the most serious offenses, including murder. (See Cal. Code Regs., tit. 15, §§ 4951–4957.) A minor committed to DJJ must generally be discharged no later than 23 years of age. (§ 607, subd. (f).)' [Citation.]" (*Lara, supra*, 4 Cal.5th 299, 306–307, quoting *People v. Vela* (2017) 11 Cal.App.5th 68, 73–74.)

75

the gang-related firearm enhancement findings under section 12022.53, subdivision (e) in counts 3, 4, 5, and 6.  We remand the matter to the trial court to permit the People to elect to retry the gang special circumstance and gang-related enhancements or, if the People do not so elect, for the trial court to proceed with resentencing Buchanan in conformance with this opinion.  The trial court is advised that the current abstract of judgment does not properly reflect the trial court's oral pronouncement of judgment that firearm use enhancements were imposed under section 12022.53, subdivision (d) in counts 3 and 5.

MOOR, J.

I concur:

RUBIN, P.  J.

The People v. Mikell Buchanan

B305671


BAKER, J., Concurring



I agree the true findings on the gang enhancements and the related special circumstance must be reversed.  But I would not permit retrial because I believe there was insufficient evidence of both even under prior law.  (*People v. Prunty* (2015) 62 Cal.4th 59, 76.)  I also decline to join the majority's discussion of Penal Code section 1109, as I believe it is unnecessary to decide the retroactivity of that statute in light of the reversal of the gang enhancements and the related special circumstance— essentially for the reasons mentioned at pages 69–70 of the opinion for the court.  With these caveats, I join the balance of the majority's opinion.



BAKER, J.